UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 07-CR-60172-LENARD

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

PATRICK COULTON,

     Defendant.

_____/

## ORDER

**THIS CAUSE** is before the Court upon Defendant Patrick Coulton's Motion for Return of

Unearned Legal Fees and Imposition of Sanctions With Request for Evidentiary Hearing. (ECF No.

167). This matter was referred to the undersigned by the Honorable Joan A. Lenard, United States

District Judge for the Southern District of Florida. (ECF No. 176). A hearing on this matter was held

on January 14, 2011. (ECF No. 186).

## I.    Background

Upon being indicted on charges of various drug and money laundering offenses, Defendant

Patrick Coulton retained Emmanuel Roy, Esq. ("Roy"), and Peter Mayas, Esq. ("Mayas"), to

represent him. On May 14, 2008, Coulton pled guilty. (ECF No. 63). He was sentenced to a term of

168 months' imprisonment on July 28, 2008. (ECF No. 96).[1]

Coulton filed the instant Motion for Return of Unearned Legal Fees and Imposition of

_____

[1]Thereafter, the Court entered an Amended Judgment to reflect a 50% reduction in Defendant's
sentence upon granting the Government's Rule 35 Motion. (ECF No. 184).

CASE NO.: 07-CR-60172-LENARD

Sanctions (ECF No. 167) which invoked the Court's ancillary jurisdiction pursuant to 28 U.S.C. 1367(a) to adjudicate his fee dispute with his former counsel, Roy and Mayas.

The Court originally set this matter for hearing on November 15, 2010. (ECF No. 178). Messrs. Roy and Mayas failed to appear, but it was unclear whether they had received proper notice of the hearing. (ECF No. 181). As such, the Court postponed the hearing and instructed Coulton's current counsel, Paul D. Petruzzi, Esq., to take all reasonable steps to ensure that both Roy and Mayas were properly and sufficiently served, by any and all reasonable means, with a copy of Defendant's Motion and the Court's Order re-setting the hearing for January 14, 2011. (ECF No. 182). The Order also gave Roy and Mayas until January 4, 2011, to file a written response to Defendant's Motion. In compliance with the Court's Order, Mr. Petruzzi filed a Notice setting forth his attempts at providing notice. (ECF No. 185). He served Roy through his current counsel, and Mayas via email. Id. Mr. Petruzzi also confirmed that Roy and Mayas each received the Motion and the Order.

The evidentiary hearing was held as scheduled. (ECF No. 186). Neither Roy nor Mayas appeared nor filed a response to the Motion. Present at the hearing were Coulton and his counsel, Mr. Petruzzi; Assistant United States Attorney Joanne Fine, on behalf of the government; and Allan Sullivan, Esq., on behalf of Megan Renze, Esq., an attorney who had her CM/ECF number misappropriated by Roy and Mayas in connection with this case. The defense called three witnesses: Pamela Coulton, Defendant's wife; Zennabelle Sewell, Defendant's aunt; and Allison Reid, Defendant's cousin. The defense also introduced 17 exhibits. The undersigned finds that the witnesses were credible, their testimony corroborated by the exhibits and the record, and the exhibits

CASE NO.: 07-CR-60172-LENARD

unchallenged.

## II.    Findings of Fact

Coulton was arrested on March 11, 2008, after being indicted for committing various narcotics and money laundering offenses. (ECF No. 3, 31). The Federal Public Defender was appointed to represent him. (ECF No. 19).

Pamela Coulton, Defendant's wife, who was in London, England, at the time, was telephonically notified of Coulton's arrest by a federal agent. (Tr. at 21).[2] Mrs. Coulton proceeded to contact her neighbor in Dacula, Georgia, who confirmed that the FBI was at the marital residence and that Coulton had been arrested. (Tr. at 22). The neighbor, Beagy Francois, referred Mrs. Coulton to Emmanuel Roy, Esq., as an attorney who could "look at it." Id. Roy's billing records for March 12, 2008, indicated that he received a telephone call from Francois and had a "[c]onsultation with Pamela E. Coulton wife of Patrick Coulton . . . from London." (Exh. P).[3] The billing records further indicated that he made "[t]elephone calls to co-counsel in Miami advising of potential case." Id.

Roy advised Mrs. Coulton that he would see her the following day in Miami and that "he would need payment." (Tr. at 23). He advised her that he charged a rate of $600.00 per hour and inquired whether she "had any money." Id. Mrs. Coulton responded that she did not have money, but they "had jewelry in the house." Id. Roy advised that he would accept jewelry as payment, that his fees would be $150,000.00, and that he would not work without payment. (Tr. at 24-25). Roy then

---

[2] References to the transcript of the evidentiary hearing, docketed at (ECF No. 188), shall be cited hereinafter as "(Tr. at ___)."

[3] References to the exhibits introduced at the evidentiary hearing, docketed at (ECF No. 187), shall be cited hereinafter as "(Exh. ___)."

CASE NO.: 07-CR-60172-LENARD

sent Mrs. Coulton a "contract for legal services" via email. (Tr. at 25); (Exh. K).

Mrs. Coulton retained Roy to represent Coulton on March 12, 2008. The fee agreement stated that it was "for legal services between Roy & Associates, P.C. and the Law Offices of Peter U. Mayas located at 16211 North East 18th Avenue, North Miami Beach, Florida 33169, and Mr. Patrick Coulton and Mrs. Pamela E. Coulton residing at 1745 San Borne Way, Dracula, Georgia 30019." (Exh. K); (Tr. at 26). The agreement set forth that the fees would be calculated at the rate of $600.00 per hour, that a "first down payment in the amount of $150,000.00" was required, and "that any modifications of th[e] agreement must be in writing, and signed by both, Counsel and Client." (Exh. K) (emphasis added). The agreement contained signature lines for "Emmanuel Roy, Esquire" an "Peter U. Mayas, Esquire" and was attached to a letter from Roy to Mrs. Coulton which instructed her to execute the agreement and return it to him via facsimile. Id.

Roy's billing records indicated that he traveled to Miami, FL, on March 13, 2008, met with Coulton at the Federal Detention Center, and made telephone calls to AUSA Joanne Fine, Mrs. Coulton, Edna Coulton, and Gordon Coulton. (Exh. P). Roy billed for 10 hours of work that day. Id.

On March 14, 2008, Roy appeared before the Honorable Ted. E. Bandstra and announced that he would be filing a temporary notice of appearance as counsel for Defendant. Id.; (ECF No. 25). According to the billing records, Roy also met with Coulton , "co-counsel Peter U. Mayas," AUSA Fine, and Agent "Cuddington," and made telephone calls, for which he billed a total of 12 hours. Exh. P. The court minutes reflected that the hearing lasted 5 minutes. (ECF No. 25).

Mrs. Coulton had several phone conversations with Roy around this time period because she was still in London. (Tr. at 23-28). Roy confirmed, *inter alia*, that he obtained the Coultons' jewelry

from their home and that he would travel to London to obtain Mrs. Coulton's wedding and engagement rings and further "discuss the case and his payment." (Tr. at 27-28). The billing records corroborated these events in that they documented several phone calls with Mrs. Coulton and Francois, as well as a "flight to Georgia" on March 15, 2008. (Exh. P). Roy never advised Mrs. Coulton that he was simultaneously discussing fee arrangements with other members of the Coulton family. (Tr. at 41).

With respect to the other Coulton family members, Roy's billing records for March 15th and 16th documented phone conversations between Roy, Mrs. Sewell, Ms. Reid, and other members of the Coulton family. Exh. P. Mrs. Sewell and Ms. Reid testified that they discussed Coulton's arrest with Roy in order to make payment arrangements. (Tr. at 49-51; 65). Roy advised Mrs. Sewell and Ms. Reid that he was also working with Mayas, "his partner in Florida." (Tr. at 52; 66). Mrs. Sewell called Roy to find out "what needed to be done." (Tr. at 48). Roy told her how much it would cost to represent Coulton and that he needed to be paid by cashier's check. (Tr. at 49). Mrs. Sewell, Ms. Reid, and other family members pooled funds from their savings accounts, pension plans, and a credit union loan to pay the legal fees to Roy. (Tr. at 49-52). Mrs. Sewell provided Roy with cashier's checks totaling $83,000.00. (Tr. at 53). The copies of the cashier's checks showed payments to Roy & Associates as follows: $30,000.00 on March 17, 2008; $4,000.00 on March 24, 2008; $16,000.00 on April 14, 2008; $10,000.00 on April 16, 2008; $3,200.00 and $10,000.00 on May 12, 2008; and $13,000.00 on August 2, 2008. (Exh. L). Mrs. Sewell never received copies of IRS Form 8300 evidencing these payments, and Roy's billing records were inconsistent with regard to the amounts documented in Defendant's exhibits. (Tr. at 53); (Exh. L; P). Roy failed to advise

CASE NO.: 07-CR-60172-LENARD

them that he was also obtaining jewelry and other assets from Mrs. Coulton as payment toward his legal fees. (Tr. at 54). Even a cursory review of the billing records concerning the time billed, the services rendered, and the amounts paid, reveals that they are fraudulent.

On March 18, 2008, Coulton appeared in court for his arraignment and detention hearing represented by the Public Defender. (ECF No. 30). Neither Roy nor Mayas appeared on Coulton's behalf despite having been (1) retained pursuant to the retainer agreement, and (2) paid approximately $55,800.00 in jewelry and $30,000.00 by cashier's checks. (ECF No. 30); (Exh. P; K); (Tr. at 41; 54). According to the court's minutes, no detention hearing was held because Coulton, through the Public Defender, stipulated to a high corporate surety bond with Nebbia condition. (ECF No. 30). Roy's billing records, by contrast, indicated that, on March 17th and 18th, he worked a total of 21 hours on Defendant's case. (Exh. P).

On March 19, 2008, Roy and his wife flew to London, England, to meet with Mrs. Coulton. Id.; (Tr. at 27-29). Roy explained that he was flying to London "to get the ring . . . and discuss the case and his payment." (Tr. at 28). Mrs. Coulton had two brief meetings with Roy in London. (Tr. at 29-34). She described the first meeting as occurring over breakfast at the hotel where Mr. and Mrs. Roy were staying. (Tr. at 30). Mrs. Coulton, her niece, Roy, and his wife, Rebecca Newlin Roy, engaged in "just light talking" until they finished eating, and then Roy asked her to hand over her wedding ring at the table. Id. Although Mrs. Coulton "had difficulty taking it off," she did as he asked. Id. The ring set was valued at $23,000.00. The four of them moved to a "business center" where Roy continued to demand payment and told Mrs. Coulton that he knew about the "condo in Florida" and needed her "to sign it over to him." (Tr. at 31).

CASE NO.: 07-CR-60172-LENARD

Roy gave Mrs. Coulton a blank warranty deed that he prepared for the Coultons' condominium located at 5031 Wyles Road, Unit 102, Coconut Creek, Florida, and told her to sign it. Id.; (Exh. M). The warranty deed specified that the Coultons were conveying the property to "Rebecca Newlin" "for and in consideration of the sum of $10.00." Id. Mrs. Coulton signed the deed absent any notary section or witness signatures. (Tr. at 34). Roy also presented Mrs. Coulton with a sale and purchase contract for this property stating that the purchase price was $75,000.00. (Tr. at 32-37); (Exh. M). Mrs. Coulton testified that she never received any money from either Roy or his wife in connection with this transaction and that, while the value of the property was $256,000.00, it was encumbered by two mortgages at the time. (Tr. at 37). Moreover, the Coultons had tenants renting the condo unit for $1,200.00 per month. (Tr. at 36). Roy told Mrs. Coulton to advise the tenants that he would be collecting the rent in the future. Id. Roy's billing records for this time period indicated that he performed a total of 47 hours of work on Defendant's case over three days. (Exh. P). Roy and his wife did not return to the United States until March 24, 2008. Id.; (Tr. at 28-30).

On March 24, 2008, Roy and Mayas filed a joint notice of appearance as counsel for Coulton. (ECF No. 40). According to the docket, the notice was filed by Megan Renze, Esq., via the District Court's CM/ECF filing system. Id.; (Exh. B). According to Ms. Renze, neither Roy nor Mayas had permission to use her account. (ECF No. 169); (Exh. A). The following day, a second, hand-signed notice of appearance was filed by Roy and Mayas. (ECF No. 41); (Exh. C). A hand-signed stipulation for substitution of counsel was filed on March 26, 2008, substituting Roy and Mayas as counsel. (ECF No. 42); (Exh. D). The document was also filed using the CM/ECF identification belonging to Ms. Renze. (ECF No. 42).

CASE NO.: 07-CR-60172-LENARD

At the time that Roy and Mayas entered their joint notices of appearance and filed the Motion for Substitution of Counsel, neither had been admitted to practice before this Court. Indeed, both Roy and Mayas were notified in writing by Catherine Wade, Attorney Admissions/Executive Assistant for the Clerk of the Court, United States District Court for the Southern District of Florida, that they were not members of the bar of this Court. (Exh. E; F; G). Roy was first notified by letter dated February 8, 2007, after appearing as counsel in Shubskaya v. Carnival Cruise Lines, No. 07-20286-Civ-Huck. (Exh. E). He was again notified that he was not authorized or admitted to practice in this District by letter dated June 10, 2008, after appearing as counsel in United States v. McBride, No. 08-8127-MJ-Hopkins. (Exh. F). Similarly, Mayas was notified by letter dated June 10, 2008, after also appearing in McBride, that he was not authorized to practice in this District. (Exh. G).

Despite their ineligibility to practice before this Court, neither Roy nor Mayas ever informed Coulton, his wife, his family, AUSA Fine, or the Court, that he was not authorized to appear as counsel in this District. (Tr. at 12; 56); (ECF No. 169). On the contrary, Roy actually lied to Defendant's family informing them that he was not only a former Assistant District Attorney in Florida, but that he had also worked with AUSA Fine. (Tr. at 57).

On April 28, 2008, the Court entered a Notice of Hearing setting Coulton's change of plea before District Court Judge Joan A. Lenard. (ECF No. 57). According to the billing records, on that day, Roy attended a "court hearing on Mr. Coulton['s] Plea Agreement" and had a "visit with Federal Judge Madden Joan[4] in regard to a Hearing regarding a possible change of plea." (Exh. P). According

---

[4]There is no District Court Judge by the name of Madden Joan sitting in the United States District Court for the Southern District of Florida.

CASE NO.: 07-CR-60172-LENARD

to the docket, no hearing occurred on April 28, 2008, and the undersigned entertains serious doubts that Roy "visited" with any District Court Judge. (ECF No. 57). Roy attributed 7 hours of work to this entry. (Exh. P).

Roy's billing records also indicated that he spent 7 hours the following day going over the plea agreement with Coulton, the "time to be served," and other matters. Id. Not only was this time entry fraudulent, but it was also significant because Mrs. Sewell was told by Roy that he was able to obtain a plea for Coulton that called for a sentence of between 5 and 7 years and "that Patrick might not even serve any time at all." (Tr. at 57-58). At that point, Roy was continuing to solicit payment from both Mrs. Sewell and Mrs. Coulton. (Tr. at 41; 54). However, at no time did Roy either advise Mrs. Sewell that Mrs. Coulton had paid him already with jewelry and a condo, or advise Mrs. Coulton that Mrs. Sewell had been paying him with cashier's checks. Id. Rather, Roy continued to lie telling Mrs. Coulton that she had been indicted but that he was getting the charges dropped, and that he was able to obtain an agreement that would assure that Coulton would only receive a 5 to 6 year sentence. (Tr. at 42-43). Roy used these lies to further obtain assets belonging to the Coultons and their family. (Exh. J).

The billing records for April 30, 2008, indicated that Roy worked 18 hours on the case by driving to Georgia and getting certain property released from forfeiture. (Exh. P). Not only was this entry fraudulent, but Roy also lied to Mrs. Coulton in order to take possession of her Porsche Cayenne SUV that had been seized by the government, but returned to her. (Tr. at 37-39). As Mrs. Coulton testified, Roy told her that the court had "awarded him" her 2004 Porsche Cayenne, valued at $40,000.00, as fees in the case. (Tr. at 39). Roy had the vehicle signed over to his wife, Newlin.

CASE NO.: 07-CR-60172-LENARD

Id. Newlin flew to Georgia, and she and Roy drove the car back to their home in New York. Id. at 39-41.

On May 14, 2008, Coulton appeared before Judge Lenard for his change of plea. (ECF No. 63). Mayas, by all accounts, was acting as Coulton's counsel in the case with Roy, and represented Coulton during the change of plea. Id. There can be no doubt that Mayas was representing Coulton as co-counsel because, aside from the fee agreement (Exh. K), and notice of appearance (ECF No. 41), Mrs. Sewell and Ms. Reid met with him at his office shortly after Coulton's arrest, and he introduced himself as co-counsel representing Coulton. (Tr. at 55-56). Similarly, Mayas was also introduced to Mrs. Coulton as Coulton's lawyer when Mrs. Coulton met with him after retrieving her 1999 Honda Civic that had been seized. (Tr. at 43). Mrs. Coulton and Roy met with Mayas at his house. (Tr. at 45). Mayas used the opportunity to not only press Mrs. Coulton for more money, but also to make "a pass" at her "imply[ing] that if [she] d[id]n't go ahead with his wishes, that Patrick would stay in prison and rot." Id. After Mayas "tried to kiss" her and she rejected his advances, he "kept badgering" her for money. Id. at 46. Mayas, however, attempted to misrepresent the true nature of his involvement in the instant matter. (Exh. I). After being asked by Petruzzi for all of Coulton's files, Mayas responded that he was only "asked by [his] friend Mr. Roy to visit Mr. Coulton and see if [he] could help," that he "visited Mr. Coulton a few times," and that he does "not have a file or any docu[ments] on the case." Id.

Prior to sentencing, Roy continued to lie about the status of Coulton's case in order to extract more money from the Coulton family. (Tr. at 42-43; 57-58; 76-78). Roy claimed, inter alia, that Coulton's "[p]lea will guarantee him no more than seven and a half (7 ½) years and no less than five

CASE NO.: 07-CR-60172-LENARD

(5) years in federal custody," that the United States agreed to return the marital residence in Georgia to the Coultons, and that "[a]ll charges against Pamela Coulton will be dropped including charges for tax evasion." (Exh. J); (Tr. at 76-77). In continuing to ask the Coulton family for more money, Mr. Roy even implied that he could get Mr. Coulton "a five (5) year sentence or less." Id.; (Tr. at 78). Coulton's plea agreement speaks for itself and bears absolutely no resemblance to those representations. (ECF No. 68).

Coulton was sentenced on July 28, 2008, to a term of 168 months' imprisonment. (ECF No. 96). Coulton was represented by Roy and Mayas at sentencing. (ECF No. 111). Neither Roy nor Mayas advised Judge Lenard that they were not authorized to practice before the District Court. Id. Both Roy and Mayas led Coulton and his family to believe that they would continue to represent Coulton to gain a reduction of his sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure and to address his medical issues while incarcerated. (Exh. B; C; D; K; Q); (Tr. at 78-79). However, both Roy and Mayas "proved especially difficult to reach after the sentencing hearing." (Tr. at 79); (ECF No. 142). Ms. Reid finally resorted to calling Roy using a calling card, because she had "the impression he recognized [her] telephone number." (Tr. at 79). The family "also resorted to e-mail because there were simply no responses forthcoming from his office." Id. "In one of the e-mails [Ms. Reid] went as far as asking [Roy] whether or not he still represented Mr. Coulton, because at that point, it simply was not clear that he did." (Tr. at 80). When Roy finally responded to one of Ms. Reid's inquiries, he told her that he had been invited to President Obama's inauguration and that, since the "head of the U.S. Bureau of Prisons" would be there, he would discuss Mr. Coulton's medical issues with him at that time. (Exh. Q); (Tr. at 61; 82). Roy was also

CASE NO.: 07-CR-60172-LENARD

continuing to request money from the family. (Tr. at 61).

In June of 2009, Roy was charged with 38 violations of attorney disciplinary rules in New York involving fraud, dishonesty, theft from clients, and making material misrepresentations to a court, including filing his own false affidavit. (Tr. at 83-84); (ECF No. 64). Roy voluntarily surrendered his law license in New York in February of 2010, and was suspended by the Florida Bar shortly thereafter. (ECF No. 164). Roy never advised Coulton, his family, the Court, or AUSA Fine of any of these events. (Tr. at 83-85). Meanwhile, Mayas appeared to have abandoned Coulton altogether. On February 19, 2009, the District Court's Clerk's Office, after several unsuccessful attempts to send him court notices in this case, gave up trying. (ECF No. 142 ).

On July 6, 2010, AUSA Fine filed a motion to reduce Defendant's sentence pursuant to Fed. R. Crim. P. 35, in light of his cooperation with the government. (ECF No. 153). However, as Coulton's counsel was non-responsive, a hearing had to be set for the potential appointment of counsel in advance of the Rule 35 hearing. (ECF No. 155, 156).

Paul Petruzzi, Esq., entered a notice of appearance as counsel for Coulton on August 12, 2010. (ECF No. 161). After unsuccessful attempts to obtain Coulton's files from Roy and Mayas, (Exh. H; I), the Rule 35 hearing was conducted, and Coulton's sentence was reduced to 84 months. (ECF No. 184). The instant litigation followed.

## III.   Conclusions of Law

### A.   Fees must be disgorged.

#### 1.   Ancillary jurisdiction is appropriately invoked.

Federal courts, regardless of the cause of action adjudicated, maintain ancillary jurisdiction

CASE NO.: 07-CR-60172-LENARD

to address attorney fee disputes. 28 U.S.C. § 1367 (a); Garcia v. Teitler, 443 F.3d 202, 206-210 (2nd Cir. 2006) (finding ancillary jurisdiction over a fee dispute in a criminal matter where the attorney was prohibited from representing co-defendants due to a potential conflict of interest); Garrick v. Weaver, 888 F.2d 687, 690 (10th Cir. 1989) (finding that "[d]etermining the legal fees a party to a lawsuit properly before the court owed its attorney, with respect to the work done in the suit being litigated, easily fits the concept of ancillary jurisdiction"); United States v. Weissman, No. S294CR760(CSH), 1997 WL 334966, at *4-5 (S.D.N.Y. Jun. 16, 1997); see also, United States v. Josue, No. 09-CR-20543-Martinez/Brown (S.D. Fla. 2010); United States v. Prada, No. 04-20446-CR, 2007 WL 2572301 (S.D. Fla. Sept. 6, 2007); United States v. Brumer, 420 F.Supp.2d 206 (S.D.N.Y. 2005).

"Ancillary jurisdiction rests on the premise that a federal court acquires jurisdiction of a case or controversy in its entirety." Jenkins v. Weinshienk, 670 F.2d 915, 918 (10th Cir. 1982). Without the power to deal with issues ancillary or incidental to the main action, courts would be unable to effectively dispose of the principal case nor "do complete justice in the premises." Morrow v. District of Columbia, 417 F.2d 728, 738, n. 36 (D.C. Cir. 1969) (citations omitted). "The major purpose of ancillary jurisdiction . . . is to insure that a judgment of a court is given full effect; ancillary orders will issue when a party's actions, either directly or indirectly, threaten to compromise the effect of the court's judgment." Id. Along these lines, the United States Supreme Court has instructed that ancillary jurisdiction may be exercised "for two separate, though sometimes related, purposes: (1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent . . . and (2) to enable a court to function successfully, that is,

CASE NO.: 07-CR-60172-LENARD

to manage its proceedings, vindicate its authority, and effectuate its decrees . . . ." Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 380-81, 114 S.Ct. 1673, 1677, 128 L.Ed.2d 391 (1994) (citations omitted).

The ancillary jurisdiction of federal courts has repeatedly been invoked to address attorney fee disputes in criminal cases. See e.g., Garcia, 443 F.2d at 207-209; Brumer, 420 F.Supp.2d at 206-07; Prada, 2007 WL 2572301 at *1; Josue, at (ECF No. 95). In both Prada and Josue, District Court Judges in this District exercised ancillary jurisdiction to resolve attorney fee disputes. In Prada, District Court Judge Adalberto Jordan found jurisdiction and referred the matter to Magistrate Judge Edwin G. Torres for a hearing on the merits. Prada, at 1. After hearing from the parties, Magistrate Judge Torres concluded that the defendant had discharged his attorney without cause and that, under Florida law, the attorney was permitted to retain the reasonable value of his services rendered before discharge. Id. In Josue, District Court Judge Jose E. Martinez referred the matter to Chief United States Magistrate Judge Stephen T. Brown who, after finding jurisdiction, held several evidentiary hearings on the issues presented. Josue, No. 09-CR-20543-JEM.

In Garcia, the attorney was retained by co-defendants who were husband and wife, to defend them against criminal charges. 443 F.3d at 205. The attorney received a total of $40,000.00 in retainer fees from both defendants. Id. After holding a joint representation/conflict hearing, pursuant to Fed. R. Crim. P. 44, the Court ruled that the attorney would not be permitted to represent both defendants. Id. Ultimately, the attorney represented neither one. Id. Accordingly, the defendants requested the return of the initial fees provided to the attorney, while the attorney claimed he was owed additional fees in the amount of $27,250.00 for services rendered. Id. After the defendants

CASE NO.: 07-CR-60172-LENARD

attempted to resolve the fee dispute extrajudicially, the District Court held an evidentiary hearing and ruled that the attorney had been discharged "for cause" and ordered him to return to the defendants the entire amount he was paid. Id. The District Court further ruled that the attorney had fabricated the additional billing statement in an effort to justify keeping the $40,000.00 he had been paid and to try to obtain another $27,250.00 in additional fees." Id. at 206. The attorney challenged the District Court's jurisdiction and its findings of fact. Id. at 205. However, the Second Circuit affirmed the District Court's rulings. Id.

Accordingly, the undersigned finds that this Court may exercise its ancillary jurisdiction over the instant fee matter.

## 2.    A full refund is due as the fee agreement was void *ab initio.*

After finding that this Court's jurisdiction is appropriately exercised, the Court must look to Florida law to determine what amount, if any, is due to be refunded to Coulton and/or his family, and how much, if any, may be retained as earned by the attorneys. Indeed, "[i]n matters of state law, federal courts are bound by the ruling of the state's highest court." Veale v. Citibank, F.S.B., 85 F.3d 577, 580 (11th Cir. 1996).

The Florida Supreme Court has held that, where an attorney is not authorized to practice in the jurisdiction in which the lawyer nevertheless practiced, he may not collect a fee. Morrison v. West, 30 So.3d 561, 567-68 (Fla. 2010) (finding that an attorney not licensed to practice law in Florida, but who provided legal services in Florida, was not entitled to collect the *quantum meruit* value of his fee, as it violated public policy for a court to award a fee for the unlicensed practice of law) (citing Fla. Stat. § 454.23 (2004), and Rule 10-2.1(c) of the Rules Regulating the Florida Bar);

CASE NO.: 07-CR-60172-LENARD

Chandris, S.A. v. Yanakakis, 668 So.2d 180, 184 (Fla. 1995). Moreover, at least one federal court of appeals has, under similar circumstances, agreed. See Z.A. v. San Bruno Park School District, 165 F.3d 1273, 1276 (9th Cir. 1999). As the Ninth Circuit stated:

> A person is or is not licensed to practice law in a particular forum. There is no halfway. If not licensed, one cannot practice in that forum and cannot charge or receive attorney's fees for such services under penalty of criminal law.

Id., at 1276. Under Florida law, therefore, it is clear that an attorney completely forfeits his fees if no valid fee agreement ever existed. Morrison, 30 So.3d at 565; see also Chandris, 668 So.2d at 185; Pippin v. Playboy Entertainment Group, Inc., No. 802CV2329T17EAJ, 2006 WL 213851, at * 11 (M.D. Fla. 2006); Searcy, Denney, Scarola, Barnhart, and Shipley, P.A. v. Scheller, 629 So.2d 947, 955 (Fla. 4th DCA 1993). Moreover, under Florida law, "an attorney displaying conduct sufficient to void an agreement in law should not be allowed to profit from his blatantly unprofessional conduct in equity." Jackson v. Griffith, 421 So.2d 677, 678 (Fla. 4th DCA 1982).

Here, on that basis, Coulton and his family are entitled to receive a full refund from Roy and Mayas. Both attorneys were not only engaged in the knowing unauthorized practice of law before this Court, but they misrepresented themselves to the client and his family when inducing them to execute the retainer agreement which specifically called for that representation. Additionally, both attorneys obtained property from Coulton and his family outside the scope of the fee agreement and used threats, lies and coercion in so doing. Accordingly, the fee agreements were void *ab initio*, and under no circumstances should the attorneys be permitted to profit from their misconduct by being permitted to retain anything of value they obtained from Coulton and his family.

CASE NO.: 07-CR-60172-LENARD

**B.      Ethical obligations of attorneys.**

Both Roy and Mayas engaged in a myriad of willfully unethical behaviors not befitting the role of attorneys practicing before this, or any other, court. Accordingly, these violations further support the relief requested by Coulton.

Initially, it must be noted that "[a] lawyer, as a member of the legal profession, is a representative of clients, an officer of the legal system, and a public citizen having special responsibility for the quality of justice." Rules of Professional Conduct, Chapter 4 of the Rules Regulating the Florida Bar, Preamble (2010). Therefore,

> A lawyer's conduct should conform to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs. A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others. A lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers, and public officials. While it is a lawyer's duty, when necessary, to challenge the rectitude of official action, it is also a lawyer's duty to uphold legal process.

Id.

Roy and Mayas committed several clear violations of the ethical rules and responsibilities they took an oath to uphold. These violations will be discussed, in detail, *seriatum*.

**1.      Violations of Rule 4-1.3: Diligence.**

Rule 4-1.3 requires that a lawyer "act with reasonable diligence and promptness in representing a client." Rule 4-1.3, Fla. Rules of Professional Conduct (2010). As the commentary to this rule points out, lawyers are required to "act with commitment and dedication to the interest of the client . . . [because] [a] client's interest often can be adversely affected by the passage of time of the change of conditions." Id., Commentary. Thus, "[e]ven when the client's interests are not

affected in substance . . . unreasonable delay can cause a client needless anxiety and undermine the confidence in the lawyer." Rule 4-1.3, Commentary, Fla. Rules of Professional Conduct (2010). As a result, "[u]nless the relationship is terminated, a lawyer should carry through to the conclusion all matters undertaken for a client." Id.

Both Roy and Mayas abandoned Coulton despite entering unlimited notices of appearance with the court. (ECF No. 40, 41). They did so despite the fact that Coulton and his family understood they would represent Coulton through to the conclusion of the proceedings, including the reasonably anticipated reduction of his sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure. Accordingly, both of these attorneys are in clear violation of this rule.

## 2. Rule 4-1.4: Communication.

Rule 4-1.4 provides that:

A lawyer shall:

. . .

(3) keep the client reasonably informed about the status of the matter;

(4) Promptly comply with reasonable requests for information; and

(5) Consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows or reasonably should know that the client expects assistance not permitted by the Rules of Professional Conduct or other law.

Rule 4-1.4, Fla. Rules of Professional Conduct (2010).

Roy and Mayas are both in violation of Rule 4-1.4(a)(3) for failing to keep Coulton and his family reasonably informed about the status of the case, and Rule 4-1.4(a)(4) for failing to "promptly comply" with the family's "reasonable requests for information," as shown by Roy and Mayas'

CASE NO.: 07-CR-60172-LENARD

conduct in abandoning Coulton following his initial sentencing and lying to Coulton and his family prior to that date. Roy and Mayas also violated Rule 4-1.4(a)(5) as neither one was admitted to practice before the District Court and each failed to inform Coulton that they would not be permitted to represent him regardless of whether their fraud on the court was discovered. They also violated this rule insofar as their lack of admission disabled the clerk of courts from contacting them via email when relevant pleadings and orders were filed electronically. Finally, and as to Roy individually, his conduct also evidenced a clear violation of Rule 4-1.4(a)(5) as a result of his failure to inform Coulton that he was (1) charged by the New York Bar Disciplinary Committee with 38 counts of misconduct in June 2009, (2) indicted by the United States Attorney's Office for the Southern District of New York in October 2009, (3) that he voluntarily surrendered his license to practice law in New York in December 2009 (which is tantamount to disbarment), and that (4) he was suspended, on an emergency basis, from the Florida Bar in March 2010. (ECF No. 164). Any one of these events, on its own, was sufficient to subject Roy to disciplinary proceedings.

### 3.      Rule 4-1.5: Fees and Costs for Legal Services.

Rule 4-1.5 states in pertinent part:

(a) **Illegal, Prohibited, or Clearly Excessive Fees and Costs**. An attorney shall not enter into an agreement for, charge, or collect an illegal, prohibited, or clearly excessive fee or cost . . . . A fee or cost is clearly excessive when:

(1) after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee or cost exceeds a reasonable fee or cost for services provided to such a degree as to constitute clear overreaching or an unconscionable demand by the attorney; or

(2) the fee or cost is sought or secured by the attorney by means of intentional misrepresentation or fraud upon the client, a nonclient party, or any court, as to either entitlement to, or amount of, the fee.

CASE NO.: 07-CR-60172-LENARD

Rule 4-1.5, Florida Rules of Professional Conduct (2010).

Roy, Mayas, and their respective law firms, entered permanent notices of appearance on behalf of Coulton; both Roy and Mayas were parties to the fee agreement with Coulton that called for representation in Federal Court; and neither Roy nor Mayas was authorized to practice in the jurisdiction. (ECF No. 40, 41, 42); (Exh. E; F; K). Accordingly, they both "sought" and "secured" their fees through fraud on the client, his family, and the court, in violation of the rule. Rule 4-1.5(a)(2), Fla. Rules of Professional Conduct (2010).

Both Roy and Mayas made requests for payment on the fee contract to Coulton, his wife, and members of Coulton's family, all of whom made payments thereon. Over time, the Coultons and their family paid $83,000.00 in cashier's checks, real property that Roy valued at $75,000.00, a Porsche SUV valued at $40,000.00, and jewelry valued at $77,800.00, for a total of at least $275,800.00. These fees were "clearly excessive" because (1) the amounts paid were far in excess of what was reasonable and customary in this District given that little actual work was done by the lawyers during the course of the representation and that the lawyers abandoned the client before their work was done, (2) the billing records were fraudulent in that they bore absolutely no resemblance to the actual work, if any, performed, and (3) that the fees were obtained through misrepresentation and fraud in that the townhouse, jewelry, and Porsche were outside the scope of the fee agreement. Roy lied about the Porsche being awarded to him rather than returned to Mrs. Coulton by the government, Roy obtained the townhouse by fraud, and Roy lied to the family about the actual amounts paid. Accordingly, he violated the Rule. See, e.g., Rule 4-1.5(a)(1) and (a)(2), Fla. Rules of Professional Conduct (2010).

CASE NO.: 07-CR-60172-LENARD

### 4.    Rule 4-1.7: Conflict of interest; Current Clients.

Rule 4-1.7(a)(2) requires that "a lawyer shall not represent a client if . . . there is a substantial

risk that the representation . . . will be materially limited . . . by the personal interest of the lawyer."

Rule 4-1.7(a)(2). According to the commentary, a "lawyer's own interest should not be permitted

to have adverse effect on representation of a client. For example, a lawyer's need for income should

not lead the lawyer to undertake matters that cannot be handled competently and at a reasonable fee."

Rule 4-1.7(a)(2), Fla. Rules of Professional Conduct (2010). For the reasons discussed *supra*, in

Sections (1) through (3), and in the findings of fact, this Court finds a violation of this rule as well.

### 5.    Rule 4-1.8: Conflict of interest; Prohibited and Other Transactions.

Rule 4-1.8 prohibits lawyers from certain specified transactions with clients that create actual

or potential conflicts of interest. Specifically, the rule states that:

> A lawyer shall not enter into a business transaction with a client or knowingly acquire
> an ownership, possessory, security, or other pecuniary interest adverse to a client,
> except a lien granted by law to secure a lawyer's fee or expenses unless:
>
> (1) the transaction and terms on which the lawyer acquires the interest are fair and
> reasonable to the client and are fully disclosed and transmitted in writing to the client
> in a manner that can be reasonably understood by the client;
>
> (2) the client is advised in writing of the desirability of seeking, and is given a reasonable
> opportunity to seek, the advice of independent legal counsel on the transaction; and
>
> (3) the client gives informed consent, in a writing signed by the client, to the essential terms
> of the transaction and the lawyer's role in the transaction, including whether the lawyer is
> representing the client in the transaction.

Rule 4-1.8(a)(1-3), Fla. Rules of Professional Conduct (2010).

Roy violated this section of the ethical rules in several ways. It is clear from the record that

Roy obtained the Coultons' townhouse. He prepared a deed and notarized it in order to have the

CASE NO.: 07-CR-60172-LENARD

property transferred to his wife. He also prepared a sales contract that specifically stated the purchase price was $75,000.00. In so doing, he never advised the Coultons of anything in writing–much less give them an opportunity to seek the advice of an independent lawyer. The terms of the transaction were neither fair nor reasonable, and the deed itself was fraudulent. The same can be said of the manner by which Roy obtained the Coultons' jewelry and Porsche. Roy lied to Mrs. Coulton about the payments made by Coulton's family in order to obtain jewelry outside the scope of the fee agreement. Similarly, Roy lied about being "awarded" by the Court as a fee Mrs. Coulton's Porsche. Accordingly, Roy violated this rule as well..

### 6.      Rule 4-3.3: Candor Toward the Tribunal.

One of the basic ethical requirements is that a lawyer be honest with the court. Rule 4-3.3(a), therefore, provides that "[a] lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer . . . ." Rule 4-3.3(a)(1), Fla. Rules of Professional Conduct (2010).

Both Roy and Mayas violated this rule through action and omission. First, both lawyers falsely represented that they were permitted to practice before the Court by filing their notices of appearance. Also, by misappropriating another lawyer's CM/ECF number, they falsely implied that they were authorized to file documents in this cause. Finally, neither Roy nor Mayas ever advised this Court that the Clerk's office had notified them that they were not eligible to practice in this District. Roy also never advised this Court that he had been suspended from the practice of law. Accordingly, both failed in their duty of candor to this Court. See Rule 4-3.3(a)(1), Fla. Rules of Professional Conduct (2010).

CASE NO.: 07-CR-60172-LENARD

7.      **Rule 4-5.5: Unlicensed Practice of Law; Multijurisdictional Practice of Law.**

Rule 4-5.5 provides that "[a] lawyer shall not practice law in a jurisdiction other than the lawyer's home state, in violation of the regulation of the legal profession in that jurisdiction, or in violation of the regulation of the legal profession in the lawyer's home state or assist another in doing so." Rule 4-5.5(a), Fla. Rules of Professional Conduct (2010). The rule also clearly directs that "[a] lawyer who is not admitted to practice in Florida shall not . . . appear in court, administrative agency or tribunal." Rule 4-5.5(b)(3), Fla. Rules of Professional Conduct (2010). Significantly, the commentary to Rule 4-5.5(a) states that it "applies to unlicensed practice of law by a lawyer" and that "[a] lawyer may practice law only in a jurisdiction in which the lawyer is authorized to practice." Rule 4-5.5(a), Commentary, Fla. Rules of Professional Conduct (2010). Similarly, the commentary to Rule 4-5.5(b) "prohibits a lawyer who is not admitted to practice in Florida from appearing in a Florida court, before an administrative agency, or before any other tribunal in Florida, unless the lawyer has been granted permission to do so." Rule 4-5.5(b), Commentary, Fla. Rules of Professional Conduct (2010).

Here, the record is clear. Neither Roy nor Mayas was admitted to practice before this Court. They misappropriated another lawyer's identification to represent Coulton. They were on notice that they were engaging in the unauthorized practice of law in this court during the pendency of Coulton's case. They informed no one–not even the Court–of their disability, and continued with the representation regardless.

8.      **Rule 4-8.4: Misconduct.**

Rule 4-8.4 states as follows:

CASE NO.: 07-CR-60172-LENARD

A lawyer shall not:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation . . .

(d) engage in conduct in connection with the practice of law that is prejudicial to the administration of justice . . . .

Rule 4-8.4(a)-(d), Fla. Rules of Professional Conduct (2010).

Roy and Mayas, for the reasons set forth in the findings of fact and conclusions of law, violated each of these sections. They violated the rules of professional conduct described herein at sections B(1) through (8). Roy prepared a fraudulent deed and made misrepresentations to defraud the Coultons of their money, jewelry, and car. They each misrepresented their status before the Court, and they each threatened the administration of justice.

### C.   Sanctions.

#### 1.   This Court has the inherent power to impose sanctions.

"Federal courts have the inherent power to impose sanctions on parties and lawyers." Spolter v. Suntrust Bank, 403 Fed. App'x 387, 390 (11th Cir. 2010) (citing In re Walker, 532 F.3d 1304, 1309 (11th Cir. 2008); see also, United States v. Butera, 677 F.2d 1376, 1383 (11th Cir. 1982); United States v. Modica, 663 F.2d 1173, 1182-86 (2nd Cir. 1981). The imposition of sanctions pursuant to the inherent power of the court entails a finding of bad faith. Spolter, 403 Fed. App'x at 390 (citation omitted). Indeed, "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." Id. (citing Chambers v. NASCO, Inc., 501 U.S. 32,

CASE NO.: 07-CR-60172-LENARD

49 , 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)).

Available sanctions include "(1) contempt citations; (2) fines; (3) public reprimands; (4) suspension from the court's bar; (5) removal or disqualification from office; and (6) recommendations to bar associations to take disciplinary action." United States v. Wilson, 149 F.3d 1298, 1304 (11th Cir. 1998); see also, United States v. Helman Dollar, 852 F.2d 498, 502, FN 3 (9th Cir. 1988) (noting a "variety of sanctions" including contempt citations, reprimand in a published opinion that specifically identifies the offending attorney by name, discipline by the legal profession, and civil actions for damages).

Additionally, as provided by the rules governing attorney discipline in this District, discipline for misconduct may consist of "(1) disbarment, (2) suspension, (3) reprimand, (4) monetary sanctions, (5) removal from this Court's roster of attorneys eligible to practice before this Court, or (6) any other sanction the Court may deem appropriate." Rule 1(b), Rules Governing Attorney Discipline, Local Rules of the United States District Court for the Southern District of Florida (2010). In light of the extensive findings of fact herein, it is appropriate for the Court to impose sanctions on attorneys Roy and Mayas. Both Roy and Mayas appeared before this court in the capacity of counsel for Coulton despite the fact that each had been advised that he was not authorized to practice in this district. Accordingly, each engaged in the unauthorized practice of law. Moreover, and for the reasons set forth *supra* at sections B(1) through (8), sanctions are clearly supported.

### 2.     This Court may impose civil contempt sanctions.

In order for an attorney to practice in a particular jurisdiction, that attorney must have the

CASE NO.: 07-CR-60172-LENARD

legal authority to do so. See *supra*, Section A(2). In the Southern District of Florida, that authority is governed by Rule 11.1(a), which states that "[t]he Bar of this Court shall consist of those persons heretofore admitted and those who may hereafter be admitted in accordance with the Special Rules Governing the Admission and Practice of Attorneys in this District." S.D. Fla. L. R. 11.1(a) (2010). Specifically, the Special Rules provide that "[e]xcept when an appearance pro hac vice is permitted by the Court, only members of the bar of this Court may appear as attorneys in the Courts of this District." S.D. Fla. L.R. 4(a), Special Rules Governing the Admission and Practice of Attorneys (2010). As a result, "[a]ny person who before his or her admission to the Bar of this Court or during his or her disbarment or suspension exercises in this District in any action or proceeding pending in this Court any of the privileges of a member of the Bar, or who pretends to be entitled to do so, may be found guilty of contempt of Court." S.D. Fla. L.R. 11.1(b) (2010).

In this case, it is indisputable that both Roy and Mayas appeared as counsel for Coulton. (ECF No. 40, 41, 42); (Exh. B; C; D). There can also be no doubt that both Roy and Mayas were personally notified, in writing, by the Clerk of this Court that each was "not a member of the Southern District of Florida Bar," and that "only members of the Bar of this District may appear as attorneys . . . ." (Exh. E; F; G). Further, Roy and Mayas undoubtedly continued to act as attorneys in this District on behalf of Coulton despite being informed that neither one was authorized to do so. (ECF No. 96, 100, 111). To make matters worse, when Roy and Mayas appeared at Coulton's sentencing hearing before this Court, neither one advised the Court that he was not entitled to so appear despite already having been so notified. (ECF No. 111). Finally, it was later discovered that Roy and Mayas had accomplished the dishonest masquerade by misappropriating the CM/ECF

account number and password of a local attorney "without [her] permission." (ECF No. 187); (Exh. A). Such willfully inexcusable conduct rises to the level of contempt of court and must be sanctioned accordingly. S.D. Fla. L.R. 11.1(b),(2010).

In finding sanctions for contempt, district courts should consider "the character and magnitude of contumacy and the probable effectiveness of any suggested sanction in bringing about the result desired." United States v. United Mine Workers of America, 330 U.S. 258, 304, 67 S. Ct. 677, 701 (1947). Appropriate sanctions may include a coercive daily fine, a compensatory fine, coercive incarceration, or a combination thereof. Int'l Union, United Mine Workers of America v. Bagwell, 512 U.S. 821, 827-29, 114 S. Ct. 2552, 2557-58, 129 L.Ed.2d 642 (1994); In re Dinnan, 625 F.2d 1146, 1150 (5th Cir. 1980); In re Lawrence, 238 B.R. 498, 501 (S.D. Fla. 1999).

Given the willful, deliberate, and fraudulently contemptuous conduct committed by Roy and Mayas; given that their conduct appears to be driven solely by a desire to line their own pockets; given that they committed numerous ethical violations during the course of their representation of Coulton; and given the public policy issues at stake, extraordinarily severe sanctions are in order. Accordingly, the Court holds Roy and Mayas, and their respective law firms, in contempt of court and imposes the following sanctions: (1) that they disgorge all fees obtained as a result of their unauthorized practice with interest; (2) that they be publicly reprimanded; (3) that they be barred from practicing in this District; (4) that they be required to reimburse Coulton for all fees and costs incurred in order to obtain counsel; (5) that they be required to fully cooperate with Coulton in his efforts to collect any and all sums owed to him as a result of these proceedings; (6) that they be required to pay all fees and costs to do so; and (7) that they each be referred to the Bar for

disciplinary proceedings.

### 3.      Unreasonable and vexatious multiplication of proceedings.

Pursuant to 28 U.S.C. § 1927, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. As § 1927 is "penal in nature," it "must be strictly construed." Norelus v. Denny's Inc., 628 F.3d 1270, 1281 (11th Cir. 2010). Strict construction of the statute necessarily requires an examination of "[t]he statute's plain language" which requires that "(1) an attorney must engage in 'unreasonable and vexatious' conduct; (2) such 'unseasonable and vexatious' conduct must 'multipl[y] the proceedings;' and (3) the amount of the sanctions cannot exceed the costs occasioned by the objectionable conduct." Id. (citing McMahan v. Toto, 256 F.3d 1120, 1128 (11th Cir. 2001).

"In order for § 1927 to be applicable, there must be a causal connection between the objectionable conduct of counsel and multiplication of the proceedings . . . objectionable conduct-even 'unreasonable and vexatious' conduct-is not sanctionable unless it results in proceedings that would not have been conducted otherwise." Peterson v. BMI Refractories, 124 F.3d 1386, 1396 (11th Cir. 1997). The Eleventh Circuit has held that "[a]n attorney multiplies court proceedings 'unseasonably and vexatiously' thereby justifying sanctions under 28 U.S.C. § 1927, 'only when the attorney's conduct is so egregious that it is tantamount to bad faith." Norelus, 628 F.3d at 1282 (quoting Amlong & Amlong, P.A. v. Denny's Inc., 500 F.3d 1230, 1239 (11th Cir. 2007) (Amlong I)).

Based on the foregoing, the undersigned finds that the conduct of Roy and Mayas was in fact

"so egregious that it is tantamount to bad faith." <u>Norelus</u>, 628 F.3d at 1280. Indeed, their conduct was "outrageous, disgusting, abhorrent." (Tr. at 91). The undersigned would go so far as to describe it as being the "most outrageous" in his "25 years on the bench and before that." <u>Id.</u> Indeed, the undersigned was "revolted" by what he heard at the evidentiary hearing. <u>Id.</u> Moreover, there can be no doubt that the conduct "multiplied" these proceedings. The docket sheet reflects that the District Court had to schedule a hearing for report re counsel as a result of Roy and Mayas' effective abandonment, replacement counsel had to be retained, and the instant proceedings resulted in addition to other proceedings that former counsel ought to have finished. Much time has been wasted by the parties and the Court as a result of Roy and Mayas' actions in this case. Accordingly, the undersigned finds that sanctions pursuant to 28 U.S.C. § 1927 are appropriate.

## IV.    Conclusion

This cause originally came before the Court pursuant to the Court's exercise of ancillary jurisdiction to address Defendant's Motion for Return of Unearned Legal Fees and Imposition of Sanctions With Request for Evidentiary Hearing. (ECF No. 167). However, as it is now clear that extraordinarily serious attorney misconduct occurred involving the unauthorized practice of law in this jurisdiction, the knowing violation of this Court's rules of practice, numerous violations of ethical rules, and potential criminal conduct, the Court adopts the following holistic approach in arriving at its remedy:

1.      Defendant's Motion for Return of Unearned Legal Fees and Imposition of Sanctions With Request for Evidentiary Hearing (ECF No. 167) is **GRANTED**. Judgment is hereby entered in favor of Defendant in the amount of $275,800.00, representing unearned legal fees paid to former

CASE NO.: 07-CR-60172-LENARD

counsel, Roy and Mayas.

2.      It is hereby **ORDERED** that Emmanuel Roy, Esq., Emmanuel Roy & Associates, P.C., the Law Offices of Emmanuel Roy, P.C., Peter U. Mayas, Esq., and the Law Offices of Peter Mayas, return to Coulton all monies, real property, and personal property obtained from Coulton and his family, or its monetary equivalent, in the total amount of $275,800.00, with the statutory interest from the date of Judgment within 10 days of being served with the Court's Order.

3.      Insofar as the conduct of former counsel rises to the level of being contemptuous pursuant to this Court's local rules resulting in the needless multiplication of these proceedings, pursuant to 28 U.S.C. § 1927, this Court finds former counsel in contempt of court and imposes the following sanctions: (1) Roy and Mayas are enjoined from practice before the Court; (2) are publicly reprimanded; (3) are referred to the relevant disciplinary bodies of the Bars of which they are, or were, members; (4) are ordered to reimburse Coulton for all fees expended to retain substitute counsel, Paul D. Petruzzi, Esq., in the amount of $7,500.00, within 10 days of being served with a copy of the court's order; (5) are ordered to pay the additional fees and costs associated with litigating Defendant's motion to refund attorney's fees (ECF No. 167); and (6) are ordered to pay any fees and costs incurred in collecting any and all monetary sums awarded to Coulton as ordered by the court if said amounts are not paid in full within 10 days of service of the Court's order.

4.      In the event that former counsel do not comply with any of the aforementioned, former counsel are further held in contempt and ordered to within 10 days of non-compliance, to: (a) provide current counsel with sworn personal and business financial statements, and (b) file sworn affidavits with the court certifying that they have complied with these requirements.

CASE NO.: 07-CR-60172-LENARD

5.      In the event that former counsel do not comply with the aforementioned, former counsel, their officers, agents, employees, and all those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, including financial institutions, whether acting directly or though any trust, corporation, subsidiary, division, or other device, including but not limited to fictitious business names, are hereby temporarily restrained and enjoined from:

A.      Transferring, liquidating, converting, encumbering, selling, concealing, dissipating, disbursing, assigning, spending, withdrawing, pledging, loaning, granting a lien or security interest or other interest in, or otherwise disposing of any funds, credit instruments, real or personal property, accounts, contracts, shares of stock, or other assets, wherever located, including outside the United States, that are: (a) owned or controlled by Emmanuel Roy, Esq., Emmanuel Roy & Associates, P.C., the Law Offices of Emmanuel Roy, P.C., Peter U. Mayas, Esq., and the Law Offices of Peter Mayas, in whole or in part, including but not limited to, any assets held by, for, or in the name of Emmanuel Roy, Esq., Emmanuel Roy & Associates, P.C., the Law Offices of Emmanuel Roy, P.C., Peter U. Mayas, Esq., and the Law Offices of Peter Mayas, at any bank or savings and loan institution or credit card processing agent, or with any broker-dealer, escrow agent, title company, commodity trading company, precious metal dealer, merchant account processor, check processor, or other financial institution, depository of any kind, or business entity; (b) in the actual or constructive possession of Emmanuel Roy, Esq., Emmanuel Roy & Associates, P.C., the Law Offices of Emmanuel Roy, P.C., Peter U. Mayas, Esq., and the Law Offices of Peter Mayas; (c) held by any agent of Emmanuel Roy, Esq., Emmanuel Roy & Associates, P.C., the Law Offices of

CASE NO.: 07-CR-60172-LENARD

Emmanuel Roy, P.C., Peter U. Mayas, Esq., and the Law Offices of Peter Mayas, as a retainer for the agent's provision of services to Emmanuel Roy, Esq., Emmanuel Roy & Associates, P.C., the Law Offices of Emmanuel Roy, P.C., Peter U. Mayas, Esq., and the Law Offices of Peter Mayas; or (d) owned, controlled by, or in the actual or constructive possession of any corporation, partnership, limited liability company, or other entity directly or indirectly owned, managed, or controlled by, or under common control with, Emmanuel Roy, Esq., Emmanuel Roy & Associates, P.C., the Law Offices of Emmanuel Roy, P.C., Peter U. Mayas, Esq., and the Law Offices of Peter Mayas.

B.      Opening or causing to be opened any safe deposit boxes titled, singly or jointly, in the name of Emmanuel Roy, Esq., Emmanuel Roy & Associates, P.C., the Law Offices of Emmanuel Roy, P.C., Peter U. Mayas, Esq., and the Law Offices of Peter Mayas;

C.      Cashing any checks or depositing any payments received by Emmanuel Roy, Esq., Emmanuel Roy & Associates, P.C., the Law Offices of Emmanuel Roy, P.C., Peter U. Mayas, Esq., and the Law Offices of Peter Mayas;

D.      Incurring charges on any credit card issued in the name, singly or jointly, of Emmanuel Roy, Esq., Emmanuel Roy & Associates, P.C., the Law Offices of Emmanuel Roy, P.C., Peter U. Mayas, Esq., and the Law Offices of Peter Mayas;

E.      Obtaining a personal secured loan; and

F.      Incurring liens or other encumbrances on real property, personal property, or other asset held in the name singly or jointly, of Emmanuel Roy, Esq., Emmanuel Roy & Associates, P.C., the Law Offices of Emmanuel Roy, P.C., Peter U. Mayas, Esq., and the Law Offices of Peter Mayas.

CASE NO.: 07-CR-60172-LENARD

Finally, this Court directs that (1) any Order issued by this Court be served on Emmanuel

Roy, Esq., and Peter U. Mayas, Esq., by the United States Marshal and that (2) any Order of the court

be published.

**DONE AND ORDERED** in Chambers, at Miami, Florida, this 16th day of September 2011.


**WILLIAM C. TURNOFF**
**United States Magistrate Judge**

cc:  Hon. Joan A. Lenard
        All Counsel of Record